**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

JACOB DANIEL CRETER,          )     CASE NO. 1:20-cv-00840
                                  )
           Plaintiff,      )
                                  )
           v.              )     MAGISTRATE JUDGE
                                  )     JONATHAN D. GREENBERG
ANDREW SAUL,              )
Commissioner of Social Security,   )
                                  )     **MEMORANDUM OF OPINION**
           Defendant.     )     **AND ORDER**
                                  )

Plaintiff, Jacob Daniel Creter ("Plaintiff" or "Creter"), challenges the final decision of Defendant, Andrew Saul,[1] Commissioner of Social Security ("Commissioner"), denying his applications for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's final decision is AFFIRMED.

---

[1] On June 17, 2019, Andrew Saul became the Commissioner of Social Security.

1

## I.    PROCEDURAL HISTORY

On November 19, 2017, Creter filed an application for DIB alleging a disability onset date of November 10, 2017 and claiming he was disabled due to chronic post-traumatic stress disorder ("PTSD"); major depressive disorder, recurrent episodes, psychotic; personality disorder; obsessive-compulsive disorder; psychosis; GERD; IBS; high blood pressure; panic attacks; and vertigo.    (Transcript ("Tr.") at 72-3.)    The applications were denied initially and upon reconsideration, and Creter requested a hearing before an administrative law judge ("ALJ").  (Tr. 127-28.)

On April 17, 2019, an ALJ held a hearing, during which Creter, represented by counsel, and an impartial vocational expert ("VE") testified, while his wife attended as an observer.  (*Id*. at 36, 55.)  On  May 23, 2019, the ALJ issued a written decision finding Plaintiff was not disabled. (*Id*. at 12-29.)  The ALJ's decision became final on December 10, 2019, when the Appeals Council declined further review.  (*Id*. at 1-3.)

On  April  20,  2020,  Creter  filed  his  Complaint  to  challenge  the  Commissioner's  final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 15, 17.) Creter asserts the following assignments of error:

> (1)    ALJ's RFC is contradicted by the two examining opinions of record; the ALJ
> did not adhere to the Agency's new rules for evaluating opinion evidence or
> give legally sufficient good reasons to reject these opinions.

(Doc. No. 15 at 1.)

## II.   EVIDENCE

### A.   Personal and Vocational Evidence

Creter was born in October 1983, and was "younger" person under social security regulations at all times during these proceedings.  (Tr. 28.)  *See* 20 C.F.R. §§ 404.1563 & 416.963.  He has at least a high school education and is able to communicate in English.  (*Id.*)  He has past relevant work as a Maintenance Repairer and Snow Plow Operator.  (*Id*. at 27.)

### B.   Relevant Medical Evidence - Mental Impairments[2]

On March 21, 2017, Creter initiated treatment with Tanveer Hussain, a psychiatrist at the Child and Family Counseling Center of Westlake.[3]  (*Id*. at 433.)  He reported experiencing chronic anxiety for most of his childhood; his past anxiety used to cause him to vomit.  (*Id.*)  He described currently experiencing intermittent sleep, high anxiety, and sleeping with stuffed animals. (*Id.*)  He also reported panic attacks.  (*Id*. at 435.)  On examination, Dr. Hussain noted Creter had a tense demeanor, normal speech and thought process, and intact description of associations.  (*Id.*)  He was diagnosed with GAD, panic disorder with agoraphobia, social anxiety disorder, and was prescribed Klonapin, Zoloft, Vistaril and Risperdal.  (*Id*. at 437-38.)

On September 27, 2017, Adriana Faur, Ph.D., completed a psychological assessment of Creter.  (*Id*. at 482-86.)  Creter reported a history of anxiety and panic attacks.  (*Id*. at 482.)  He also reported hearing voices and seeing shadows, mood swings, disturbed sleep, paranoia, debilitating

---

[2]     The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs. Creter does not challenge the Commissioner's conclusions regarding his physical impairments, and so the evidence relating to those issues is omitted.

[3]     Dr. Hussain's notes are handwritten and difficult to decipher.

3

fear of illness, and feelings of deja vu. (*Id*. at 482-84.)  Dr. Faur noted that Creter had appropriate appearance, dress and behavior, normal speech, good attention and concentration, intact memory, unremarkable perception and thought processes, fair insight and judgment, blunted affect, preoccupied thought content, and depressed mood.  (*Id*. at 482.)  Dr. Faur also observed that Creter was "inconsistent with his responses," noting he first said "that he spent all his time in hospital with dad, and on another occasion he stated he was only in the hospital twice."  (*Id*. at 485.)

On November 2017, Creter returned to Dr. Faur, who noted he exhibited intact cognitive functioning, but had dysphoric mood, inappropriate affect, and "impaired" functional status.  (*Id*. at 492-93.)  Dr. Faur reviewed the results of recent MMPI-2-rf testing with Creter.  (*Id*. at 492.)  The test indicated that Creter was experiencing symptoms of a thought disorder, anxiety and depression, which were consistent with his clinical presentation and prior testing.  (*Id*.)   Although Dr. Faur noted "some inconsistencies" in Creter's responses, she ruled out malingering. (*Id*.)

On November 30, 2017, Creter returned to Dr. Hussain, who noted that Creter was fully oriented, casually dressed, and had clear and coherent thought processes, intact cognition, and fair judgment, but limited insight, anxious mood, sad and restricted affect.  (*Id*. at 429.)  He increased Creter's dosages of Zoloft and Vistaril to treat anxiety and depression, and recommended therapy.  (*Id*.)

On January 24, 2018, Creter returned to Dr. Hussain, who noted that Creter reported still feeling sad, experiencing panic attacks, hearing voices and feeling paranoid most of the time, but had fair insight and no evidence of harmful ideation. (*Id*. at 428.)  Dr. Hussain increased Creter's dosage of Risperdel to treat psychosis.  (*Id*.)

4

On January 24, 2018, Dr. Hussain completed a mental status questionnaire for the Division of Disability Determination.  (*Id*. at 447-8.)   Dr. Hussain reported that Creter has auditory hallucinations, paranoia, limited cognitive functioning, and a limited ability to maintain attention, sustain concentration, persist at tasks and complete them in a timely fashion. (*Id*.)  He identified Creter's diagnoses as major depressive disorder, panic disorder, and generalized anxiety disorder. (*Id*. at  448.)  He opined that Creter does not interact with people, feels paranoia, and will decompensate quickly in response to the pressure involved in simple and routine tasks.  (*Id*.)

On January 31, 2018, therapy notes[4] indicate Creter reported an increase in panic attacks, and was focused on feelings of victimization and injustice.  (*Id*. at 570.)

On April 13, 2018, Creter's therapist referred him to Southwest General Hospital for an assessment for admission to an Intensive Outpatient Treatment Program because of worsening anxiety. (*Id*. at  454-64.) A psychosocial assessment noted Creter presented with complaints of anxiety, depressed mood, hallucinations, nausea, throwing up, dissociating, agoraphobia, impaired concentration, feelings of hopelessness, helplessness, isolation, and worthlessness, loss of energy and sleep disturbances including middle of the night waking, night terrors and nightmares. (*Id*. at 454-55, 464.)  Creter listed "empathy" and "attention to detail" as his strengths. (*Id*. at 463.)  He described his weaknesses as "self esteem, social settings, positive outlook." (*Id*.)  On examination, Creter had flat, depressed and anxious affect, deficits in his memory and attention span, tangential thought processes, and auditory and visual hallucinations.  (*Id*. at 455-56.)  The examiner noted

---

[4]     The notes from Creter's therapy at Child and Family Counseling Center of Westlake are handwritten and difficult to decipher.

Creter demonstrated cooperative behavior, appropriate appearance, intact insight and judgment, logical thought content, and normal speech. (*Id*. at 455-56.)

On November 26, 2018, therapy notes indicate Creter reported that he was "doing ok overall" and "keeping busy with side jobs and is considering going back to work, but does not feel like he can handle it, especially being around people." (*Id*. at 561.)

On August 16, 2018, Creter began treatment with Daniel Modarelli, D.O., for his complaints of left knee and ankle swelling and concerns about cancer, heart issues, possible neuropathy and fibromyalgia due to multiple issues he was experiencing.  (*Id*. at 511-14.)  Creter reported a history of "severe" depression and anxiety, but stated he had not been feeling down, depressed, or hopeless for the past two weeks. (*Id*. at 511.)  Dr. Modarelli observed Creter was "in no apparent distress or pain."  (*Id*.)

On August 31, 2018, Dr. Modarelli noted Creter was "negative for anxiety and depression," and reported he had not been feeling down, depressed, or hopeless for the past two weeks.  (*Id*. at 505, 507.)  The same notations were made in Dr. Modarelli's treatment records from October 15, 2018.  (*Id*. at  502, 504.)

On September 21, 2018, Creter underwent a psychological assessment at Crossroads.  (*Id*. at 520-29.)  Creter reported struggling with mental health issues his whole life, and described depression, anxiety, a history of impulsivity and promiscuity, self-harm, and alcohol use problems. (*Id*. at 520.)  He reported he had recently begun hoarding cats, and now had seven.  (*Id*.)  On examination, Creter's appearance was disheveled, but his hygiene, affect, attitude, speech, behavior, thought processes, thought content, judgment, attention, concentration, and language were all unremarkable. (*Id*. at 529-30, 538.)  His facial expressions were flat, his mood was anxious and

depressed, and he had impaired short-term memory and limited insight.  (*Id*. at  530.)  His dosage of Zoloft was increased.  (*Id*. at 539.)

On October 26, 2018, Dr. Modarelli's colleague, Daniel Hofius, D.O., noted  Creter was "negative for anxiety and depression," and reported he had not been feeling down, depressed, or hopeless for the past two weeks.  (*Id*. at 499, 501.)

On February 4, 2019, therapy notes state that Creter had "sad feelings" after he and his wife suffered a miscarriage. (*Id*. at 558.)

On March 21, 2019, Thomas Svete, M.D., conducted a psychiatric assessment of Creter regarding his complaints of depression and other psychiatric symptoms.[5]  (*Id*. at 600-03). Dr. Svete noted that Creter had dysthymic and anxious mood, restricted affect, circumstantial thought processes, and suspicious thought content. (*Id*. at 602.)  He also noted Creter exhibited cooperative attitude, fluent speech, fair insight and judgment, and intact cognition. (*Id*.)

On April 9, 2019, Dr. Modarelli completed a mental impairment questionnaire, and identified diagnoses of PTSD, personality disorder, anxiety and depression, opining that Creter had a "fair" prognosis. (*Id*. at 604.)  He identified the clinical basis of his opinion as "medical records from psych specialists."  (*Id*.)  He opined that Creter had the following mental functioning limitations:

- No useful ability to function in:

    - completing a normal workday and workweek without interruptions from psychologically based symptoms; and

    - to understand and remember detailed instructions.

---

[5]    Dr. Svete's notes are handwritten and difficult to decipher.

- Unable to meet competitive standards in his ability to carry out the following work-related activities on a day-to-day basis in a regular work setting:

  - carry out detailed instructions;

  - maintain attention and concentration for extended periods;

  - sustain an ordinary routine without special supervision;

  - work in coordination with or in proximity to others without being distracted by them;

  - perform at a consistent pace without unreasonable number and length or rest periods;

  - remember locations and work-like procedures;

  - interact appropriately with the general public;

  - get along with coworkers and peers without distracting them or exhibiting behavioral extremes;

  - maintain socially-appropriate behavior and adhere to basic standards of neatness and cleanliness;

  - be aware of normal hazards and take appropriate precautions; and

  - set realistic goals or make plans independently of others.

- Seriously limited but not precluded in his ability to carry out the following work-related activities on a day-to-day basis in a regular work setting:

  - understand and remember very short and simple instructions;

  - ask simple questions or request assistance; and

  - accept instructions and respond appropriately to criticism from supervisors.

(*Id.* at 604-5.)  Dr. Modarelli also opined that Creter's impairments or treatment would cause him to absent from work 50% of the time, and symptoms of Creter's impairments would cause him to be off task from performing job tasks 50% of an 8-hour work day.  (*Id.* at 605.)

8

**C.** **State Agency Reports - Mental Impairments**

On March 1, 2018, state agency reviewing psychologist Carl Tishler, Ph.D., reviewed Creter's medical records and opined that Creter had the following mental functional limitations:

- could understand, remember simple to moderately complex task instructions;

- could sustain attention and concentration on simple to moderately complex tasks;

- could sustain  moderately complex tasks as long as they involved only occasional and superficial interactions with others;

- cannot work in situations where he needs to resolve conflicts or maintain a friendly and persuasive demeanor; and

- could adapt to workplace settings in which duties were routine and predictable.

 (*Id*. at  82-84).

On June 7, 2018, state agency reviewing psychologist Karla Delcour, Ph.D., reviewed a more complete record and affirmed Dr. Tishler's conclusions.  (*Id*. at  95, 99-102).

**D.** **Hearing Testimony**

During the April 14, 2019 hearing, Creter testified to the following:

- He lives in Willoughby, with his wife and two children, ages nine and seven.  His wife works outside the home.  (*Id*. at  40.)

- He completed high school, attended three different trade schools but dropped out of each before receiving accreditations because he found them overwhelming, and struggled with reading and retaining information.  (*Id*. at  41.)

- He has had many jobs, mostly maintenance work.  Sometimes he drives his employer's truck or plow.  Other times, he drives his own truck but uses the employer's plow for snow removal.  He has never had a Commercial Driver's License.  (*Id*. at  41-2.)

- He has done both residential and commercial maintenance work, including electrical, plumbing, carpentry, HVAC, heating, ventilation, and cooling. He has

9

an "EP 608 certification,"[6] but never graduated from American Air Academy.  (*Id*. at 42.)

- Although he did not have trouble finding a job in the past, he has had trouble keeping a job.  His mood is "up and down," he gets nervous or "caught up" and forgets instructions, does something wrong, or takes too long to complete his tasks. Because of his OCD, he has to complete tasks in a certain sequence, and that causes work duties to take him longer to complete than other workers.  (*Id*. at 42-3.)

- He is currently in treatment for his mental problems.  He has sought treatment since he was younger.  He finds that, although his therapists teach him coping mechanisms and strategies like breathing and counting to ten, "when you're out and into the situation, it's a lot different than when you are in the office."  (*Id*. at 43-4.)

- When he is working, he either clashes with people or has trouble getting to work because he feels sick in the morning.  He believes his anxiety is making him feel bad, because he isn't as bad on days when noting is scheduled.  He throws up in the morning, and has had stomach issues his whole life.  This has caused him to be late to work quite a bit.  (*Id*. at 44.)

- He brought a bag with sock monkeys inside to his hearing.  He holds onto them when he gets anxious, and it helps him.  He has used them since his first "bad nervous breakdown" in 2014. (*Id*. at 45.)

- He has had problems with anger and self-destructive behavior, including self-harm, since he was a kid.  For a while, he drank too much to "kind of self-medicate," and then he began getting medical care that "bought him time" by prescribing Abilify for his depression.  However, things continued getting worse and worse.  (*Id*. at 46.)

- He had been feeling presences and seeing things that other people didn't for years, and in 2016, he became worried that he was having heart attacks.  He scheduled an appointment with a cardiologist, and went to the emergency room for treatment, but was told his symptoms were caused by anxiety.  He started having tunnel vision on his drives to work, and would get short of breath, almost blacking out.

---

[6]     The court believes this reference is to an EPA section 608 technician certification. EPA regulations (40 CFR Part 82, Subpart F) under Section 608 of the Clean Air Act require that technicians who maintain, service, repair, or dispose of equipment that could release ozone depleting refrigerants into the atmosphere must be certified.

He would call his wife to talk him through the drive.  It got worse and worse until he could no go to work.    (*Id*. at 46.)

- One benefit of being reclusive is that he is no longer exposed to the hurtful things other people say about him.  He's had "people calling him things" since childhood, and it has made his depression and self-hatred worse.  No longer feeling that pressure and hearing "constant criticism" is the only good thing about being secluded in his home.  (*Id*. at 46-7.)

- He has been treated by Dr. Modarelli for seven or eight months.  He had to transfer care from his former doctor because he could not bring himself to use the elevator, which he had to do to access his office.  Dr. Modarelli's office has stair access. (*Id*. at 48.)

- His first breakdown was triggered by a cancer scare.  In 2014, he had a cytology done, and the results showed abnormal cells.  His doctor told him cancer was a slight possibility, and he became very anxious.  (*Id*. at 49.)

- His OCD-type behaviors include a morning routine. On days when he has to leave the house for any reason, he first unplugs everything that is unnecessarily plugged in, makes sure the stove is off by checking all the knobs, checks all the windows to make sure they are locked and all blinds are closed, and makes sure all the doors are locked by tugging on each door a few times.  (*Id*. at 50-1.)

- He can't eat food anyone else has come close to or touched, and if a his pet gets on the sofa, he wipes the spot with a Clorox wipe.  (*Id*. at 51.)

- He has difficulty with his kids.  He stresses hand washing a lot with them, wipes down the fridge handle, drawer knobs and doorknobs with Clorox a few times a day.  Shaking people's hands doesn't feel right to him.  (*Id*.)

- He has had a couple of suicide attempts. The most recent was five or six months ago.  In 2005, he had another.  (*Id*. at 52.)

- He has dreams about war and fears helicopters, especially dual blade cargo planes. He also fears being watched, and keeps track of which cars are behind his when he is going somewhere.  (*Id*. at 53.)

- His wife drives most of the time, but he sometimes takes the kids to school if they miss the bus, because that is right around the corner from their home.  (*Id*.)

- On the rare occasions he has to drive a longer distance, he gives himself checkpoints by planning where he can safely pull over if he needs to.  (*Id*. at 54.)

11

- He loves his wife, and has questioned why she loves him because he is such a wreck. He has never been able to attend one of his daughter's cheerleading competitions, or go out to eat with his family. He sometimes can't even go for a walk with his kids. (*Id*. at 54-5.)

The VE testified Creter had past work as a Maintenance Repair provider and Snow Plow Tractor Operator. (*Id*. at 57.) The ALJ then posed the following hypothetical question:

[A]ssume a hypothetical person of Claimant's age, education, [and] work experience. This individual is limited to medium as defined by the regulations, medium-level work, occasional climbing of ladders, ropes and scaffolds, frequent stooping. Able to perform simple tasks and follow simple instructions, only occasional and superficial interaction with others, few if any workplace changes. Could that individual   be able to perform Claimant's past work?

(*Id*.)

The VE testified the hypothetical individual would not be able to perform Creter's past work as  Maintenance Repair provider and Snow Plow Tractor Operator. (*Id*.)  The VE explained the hypothetical individual would be able to perform other representative jobs in the economy, such as Janitor, Store Laborer, or Packer. (*Id*. at 58.)

Next, the ALJ amended the first hypothetical to add additional limitations :

[W]e're going to add that this individual would be off task more than 20% of the workday and miss or be unable to complete two or more workdays per month due to psychological stresses as well as symptoms. Can such an individual with those limitations perform the jobs you just referenced or any other jobs?

(*Id*.) The VE testified the additional limitations would eliminate all work.  (*Id*.) The VE also opined that an individual who was able to interact with coworkers and supervisors for 5% or less of a workday and was not able to have contact with the public at all would not be able to perform any competitive work. (*Id*.)

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 & 404.1505(a).

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) & 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) & 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) & 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) & 416.920(d).  Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) & 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work

exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), & 416.920(g).

Here, Creter was insured on his alleged disability onset date, November 10, 2017, and remained insured through December 31, 2022, his date last insured ("DLI.") (*Id*. at 17.)  Therefore, in order to be entitled to DIB, Creter must establish a continuous twelve-month period of disability commencing between these dates.  Any discontinuity in the twelve-month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured requirements of the Social Security Act through December 31, 2022.

2.    The claimant has not engaged in substantial gainful activity since November 10, 2017, the alleged onset date.

3.    The claimant has the following severe impairments: major depressive disorder, gastritis and duodenitis, personality disorder, and flat feet.

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c), except he can occasionally climb ladders, ropes, and scaffolds, he can frequently stoop, he is able to perform simple tasks and follow simple instructions, he can have only occasional and superficial interaction with others, and he can have few is any workplace changes.

6.    The claimant is unable to perform any past relevant work.

14

7.      The claimant was born October **, 1983, and was 33 years old, which is defined as a younger individual ages 18-49, on the alleged disability onset date.

8.      The claimant has at least a high school education and is able to communicate in English.

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding the claimant is "not disabled," whether or not the claimant has transferrable job skills.

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11.     The claimant has not been under a disability, as defined in the Social Security Act, from November 10, 2017, through the date of this decision.

(Tr. 17-29) (internal citations omitted).

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court

15

does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an

16

accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, No. 11  13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10  cv  734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10  CV  017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09  cv  1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

Creter asserts that the ALJ erred by failing to adhere to the Agency's new rules for evaluating opinion evidence and failing to give legally sufficient good reasons to reject the only two opinions by examining physicians in the record.  (Doc. No. 15 at 4.)  He notes that both doctors' opinions contain greater and more detailed limitations than those found in the ALJ's RFC determination.  (Doc. No. 15 at 7.)  He argues that no reasonable ALJ could conclude based on this record that the non-examining medical consultants' opinions are more supported and consistent with the record as those of the treating physicians.  (*Id*.)  Therefore, he asserts that the ALJ was required to treat both doctors' opinions as "equally supported and consistent with the record" under the Revised Regulations, and therefore was required to address all the factors set forth in the Revised Regulations to explain his determination of which opinion is entitled to the most weight.[7]  (*Id.* at 8.)

---

[7]     "Other factors" include, but not limited to, evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of the agency's disability program's policies and evidentiary requirements.  20 C.F.R. §§ 416.920c(a), (c)(1)-(5).

17

The Respondent asserts that the ALJ properly found that the State agency reviewing psychologists' opinions about Creter's ability to perform a range of simple work contradicted Dr. Hussain's and Dr. Modarelli's opinions because they were well-supported and consistent with totality of the objective medical evidence.  (Doc. No. 17 at 10.)  He argues the ALJ properly found that Dr. Hussain's and Dr. Modarelli's opinions were unpersuasive because they lacked sufficient objective support, and were unsupported by their own clinical findings and observations.  (*Id*. at 11.) Therefore, he argues the ALJ properly concluded that these opinions were not equally well-supported and consistent with the record as the State agency reviewing psychologists' opinions, and additional analysis was not required.  (*Id*. at 13.)

Since Creter's claim was filed after March 27, 2017,[8] the Social Security Administration's new regulations ("Revised Regulations")  for evaluation of medical opinion evidence apply to this claim. *See Revisions to Rules Regarding the Evaluation of Medical Evidence (Revisions to Rules)*, 2017 WL 168819, 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. § 404.1520c.

Under the Revised Regulations, the Commissioner will not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources."  20 C.F.R. § 416.920c(a).  Rather, the Commissioner shall "evaluate the persuasiveness" of all medical opinions and prior administrative medical findings using the factors set forth in the regulations: (1) supportability;[9] (2)

---

[8]     Creter's claim was filed November 19, 2017.  (Tr. 72.)

[9]     The Revised Regulations explain the "supportability" factor as follows: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(1).

18

consistency;[10] (3) relationship with the claimant, including length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors, including but not limited to evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of the agency's disability program's policies and evidentiary requirements. 20 C.F.R. §§ 416.920c(a), (c)(1)-(5). However, supportability and consistency are the most important factors. 20 C.F.R. §§ 416.920c(a), 404.920(b)(2).

The Revised Regulations also changed the articulation required by ALJs in their consideration of medical opinions. The new articulation requirements are as follows:

> (1) Source-level articulation. Because many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for us to articulate in each determination or decision how we considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative medical finding(s), we will articulate how we considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. We are not required to articulate how we considered each medical opinion or prior administrative medical finding from one medical source individually.

> (2) Most important factors. The factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be. Therefore, we will explain how we considered the supportability and consistency factors for a medical source's medical

---

[10]     The Revised Regulations explain "consistency" factor as follows: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(2).

19

opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record.

(3) Equally persuasive medical opinions or prior administrative medical findings about the same issue. When we find that two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported (paragraph (c)(1) of this section) and consistent with the record (paragraph (c)(2) of this section) but are not exactly the same, we will articulate how we considered the other most persuasive factors in paragraphs (c)(3) through (c)(5) of this section for those medical opinions or prior administrative medical findings in your determination or decision.

20 C.F.R. § 416.920c(b)(1)-(3).

"Although the regulations eliminate the 'physician hierarchy,' deference to specific medical opinions, and assigning 'weight' to a medical opinion, the ALJ must still 'articulate how [he/she] considered the medical opinions' and 'how persuasive [he/she] find[s] all of the medical opinions.'" *Ryan L.F. v. Comm'r of Soc. Sec.*, No. 6:18-cv-01958-BR, 2019 WL 6468560, at *4 (D. Ore. Dec. 2, 2019) (quoting 20 C.F.R. §§ 404.1520c(a) & (b)(1), 416.920c(a) & (b)(1)).  The regulations provide that, ALJs "may, but are not required to, explain how [they] considered the factors in paragraphs(c)(3) through (c)(5) of this section, as appropriate, when [they] articulate how [they] consider medical opinions and prior administrative medical findings in [a claimant's] case record." 20 C.F.R. § 404.152c(b)(2).  However, where an ALJ finds that there is more than one equally persuasive  medical opinion or prior administrative medical finding about the same issue, and they are not exactly the same, the ALJ "will articulate how [they] considered the other most persuasive factors in paragraphs (c)(3) through (c)(5) of this section for those medical opinions or prior administrative medical findings in [a claimant's] determination or decision." 20 C.F.R. § 404.1520c(b)(3).

20

### i.     Opinion of Dr. Hussain

The ALJ addressed the opinion of Dr. Hussain as follows:

> The claimant's provider, Dr. Hussain, provide[d] a mental status questionnaire about the claimant on January 24, 2018. Dr. Hussain felt the claimant had a limited ability to maintain attention and sustain concentration, persist at tasks, and complete them in a timely fashion. He explained that the claimant did not interact with people as he feels paranoia and has a limited ability to adapt. Dr. Hussain felt the claimant would decompensate quickly with pressures, in work settings or elsewhere, when involved in simple and routine or receptive[11] tasks. He stated that the claimant could remember, understand, and follow directions. Dr. Hussain based his opinion on clinical findings, including a fair appearance, hearing voices, feeling paranoid, limited cognitive functioning, fair insight and judgment, and an anxious and sad affect. The undersigned finds this opinion to be partially persuasive with respect to the claimant's ability to remember, understand, and follow directions. However, the undersigned finds the rest of the opinion unpersuasive as it is not supported by mental status examination[s] that showed the claimant was cooperative, had full eye contact, an unremarkable attention, concentration, mood, and affect findings, an appropriate and/or normal affect, good hygiene, and an appropriate appearance. The opinions are inconsistent with the opinions of the State Agency psychologists and are mostly consistent with the opinion of Dr. Moderelli[12] and the claimant's testimony about his alleged level of limitation.

(Tr. 26) (internal citations omitted). The ALJ cited four treatment records which he found inconsistent with Dr. Hussain's findings, including records from Creter's treatment with Dr. Hussain. (*Id.*)

The core of Creter's assignment of error is the assertion that the opinions of treating physicians Dr. Hussain and Dr. Modarelli are more supported and consistent with the record than the non-examining medical consultants' opinions. (Doc. No. 15 at 9.) However, it is not this Court's role to re-weigh the evidence, or substitute its judgment for that of the ALJ. *Reynolds v. Comm'r*

---

[11]     The form filled out by Dr. Hussain referred instead to "repetitive" tasks. (Tr. 448.)

[12]     Dr. Modarelli's name is misspelled throughout the ALJ's Decision.

21

*of Soc. Sec.*, No. 09 2060, 2011 WL 1228165 at *2 (6th Cir. April 1, 2011). The role of the Court is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010).

Here, the ALJ specifically cited treatment records he felt were inconsistent with Dr. Hussain's opinion, and explained why. Dr. Hussain's opinion offers no explanation for these inconsistencies. The Sixth Circuit has found that inconsistencies between a treating physician opinion and his/her own treatment records is a proper basis for rejecting a treating physician opinion. *See e.g., Hill v. Comm'r of Soc. Sec.*, 560 F. App'x 547, 549-550 (6th Cir. 2014) (finding ALJ properly rejected treating physician opinion where that physician's treatment notes "did not support his opinion" that the claimant had severe limitations and, in fact, "undermine[d] his opinion); *Leeman v. Comm'r of Soc. Sec.*, 449 F. App'x 496, 497 (6th Cir. 2011) ("ALJs may discount treating physician opinions that are inconsistent with substantial evidence in the record, like the physician's own treatment notes."); *Payne v. Comm'r of Soc. Sec.*, 402 F. App'x 109, 112 13 (6th Cir. 2010). *See also Oglesby v. Colvin*, No. 5:13CV61, 2014 WL 1156239 at *10 (N.D. Ohio March 21, 2014) (finding "the ALJ has clearly articulated his reason for giving little weight to the opinion of Dr. Schmitt, that is, Dr. Schmitt's dire conclusions regarding Plaintiff's limitations are not supported by his own treatment notes.") The ALJ specifically pointed to Dr. Hussains's treatment notes in rejecting his opinion, finding his largely normal mental status examination findings were inconsistent with his assessment of a wide array of severe mental functional limitations. For example, on November 30, 2017, Dr. Hussain's examination notes reflect that

Creter's mood was anxious and sad, with restricted affect, but Creter's thoughts were clear and coherent, his insight was limited and his judgment was fair.[13]  (Tr. 22, citing Tr. 429.)

In addition, the ALJ identified other treatment records that do not support the extreme limitations in Dr. Hussain's opinion.  For example, exam notes from a September 9, 2019 visit to the Cleveland Clinic describe Creter's affect as "normal" and "alert." (*Id*. at 577.) Exam notes from a March 21, 2019 evaluation by psychiatrist Dr. Svete describe Creter's attitude as "cooperative," his speech as "fluent," his mood "dysthymic" and "anxious," his affect "restricted," his thought content as "suspicious," and his insight and judgment as "fair." (*Id*. at 602.)  Exam notes from an April 13, 2018 exam at Southwest General Hospital describe Creter as having a flat and anxious affect, congruent with his mood, full eye contact, cooperative behavior, appropriate appearance, short attention span, and capable of reality-based thinking, with logical thought content. (*Id*. at 455-56.)  Although Creter sought intensive outpatient therapy at Southwest General, he was instead recommended to begin individual therapy, a more conservative treatment option.  (*Id*. at 464.)  The ALJ noted that the treatment notes from Creter's therapy session on September 21, 2018, describes "appropriate" facial expressions, speech, and affect, as well as cooperative behavior, unimpaired thought process and thought content, good judgment, anxious and depressed mood, and limited insight.  (*Id*. at 529-30.)  The assessor again recommended medication and individual therapy as the appropriate treatments.  (*Id*. at 531.)  The ALJ also cited additional record evidence that supported his RFC determination, including Creter's reports to healthcare providers that he was keeping busy with side jobs.  (*Id*. at 25, citing Tr. 561.)

---

[13]     Because Dr. Hussain's notes were handwritten, examination results were often illegible or omitted.

In light of the above, the Court finds the ALJ articulated "good reasons" for finding that Dr. Hussain's opinion was only "partially persuasive," and, further, that those reasons are supported by substantial evidence. While Creter urges the Court to find that the reasons given by the ALJ do not constitute "good reasons," it is not this Court's role to "reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ." *Reynolds*, 2011 WL 1228165 at *2 (6th Cir. April 1, 2011) (citing *Youghiogheny & Ohio Coal Co. v. Webb*, 49 F.3d 244, 246 (6th Cir. 1995)). *See also Vance v. Comm'r of Soc. Sec.*, No. 07-5793, 2008 WL 162942 at *6 (6th Cir. Jan. 15, 2008) (stating that "it squarely is not the duty of the district court, nor this court, to re-weigh the evidence. . . .") The Revised Regulations make clear that supportability and consistency are the most important factors for evaluating medical source opinions. 20 C.F.R. §§ 416.920c(a), 404.920(b)(2). Here, the ALJ provided good reasons for finding that Dr. Hussain's opinion was only "partially persuasive," and supported those reasons with reference to specific evidence in the record. Creter's argument to the contrary is without merit.

### ii.    Opinion of Dr. Modarelli

The ALJ addressed the opinion of Dr. Modarelli as follows:

The claimant's provider, Dr. Moderelli, provided a mental status questionnaire about the claimant on April 9, 2019. He explained that he based his opinions on clinical findings from medical records with psychological specialists. . . . The undersigned finds this opinion to be unpersuasive as he is not the claimant's primary psychological provider and there were no clinical findings from his treatment to support his conclusions. Additionally, in the opinion, Dr. Moderelli explained that he based his opinions on clinical findings from medical records with psychological specialists. The opinion is inconsistent with the opinions of the State Agency psychologists and is mostly consistent with the claimant's testimony of his alleged level of limitation.

(Tr. 26-7.)

24

Again, Creter does not address the inconsistent evidence discussed by the ALJ.  As the ALJ noted, the clinical basis for Dr. Modarelli's opinion is unclear.  Dr. Modarelli treated Creter primarily for physical ailments including left knee and ankle swelling, and concerns about cancer, heart issues, possible neuropathy, and fibromyalgia.  (*Id*. at 511-14.)  Dr. Modarelli stated that he based his opinion on "medical records from psych. specialists," but did not identify any specific providers. Creter received care from numerous medical systems including the Cleveland Clinic, University Hospitals, Integrative Psychological Health, Beacon Health, and the Child and Family Counseling Center of Westlake, and it is not clear what records Dr. Modarelli, who was affiliated with Lake Health Physicians Group, had reviewed.  Further, as the ALJ noted, Dr. Modarelli's own treatment records repeatedly described Creter as "negative for anxiety and depression," and reported he had not been feeling down, depressed, or hopeless for the two weeks prior to multiple appointments.  (*Id*. at 502, 504, 505, 507.)

Creter argues that the ALJ erred by failing to address every factor set forth in the Revised Regulations.  However, the ALJ clearly addressed the two most important factors: supportability and consistency. T he ALJ was obliged to address the other regulatory factors only if he determined that Dr. Modarelli's opinion was equally well-supported and consistent with the record as the State agency reviewing psychologists' opinions. *See* 20 C.F.R. § 404.1520c(b)(3). As courts in this District have explained, "because the ALJ's conclusion that [medical providers'] opinions were not consistent and not well-supported was reasonably drawn from the record, the ALJ's conclusion fell within the Commissioner's 'zone of choice.'  And, even if a preponderance of the evidence might have supported a different conclusion, this court is not permitted to second-guess the ALJ's decision when substantial evidence supported it." *Serowski v. Comm'r of Soc. Sec*., No. 1:19-CV-2761, 2020

25

WL 6383187, at *12 (N.D. Ohio Oct. 30, 2020); citing *O'Brien v. Comm'r of Soc. Sec.*, 819 F.

App'x. 409, 416 (6th Cir. 2020); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003);

*Biestek v. Berryhill*, 139 S. Ct. 1148, 1154, 203 L.Ed.2d 504 (2019) (internal citation omitted).)

The ALJ provided good reasons for finding that Dr. Modarelli's opinion was

"unpersuasive," and supported those reasons with reference to specific evidence in the record.

Creter's argument to the contrary is without merit.

### iii.    Other medical record evidence

Creter devotes a significant portion of his brief to documenting other record evidence that

supports Dr. Hussain's and Dr. Modarelli's conclusions about his mental functional capacity. (Doc.

No. 15 at 10-16.) However, while Creter describes at length evidence from the record that could

support a finding of disability, he fails to address the discrepancy between the doctors' opined

limitations and the inconsistent records discussed by the ALJ. As explained *supra*, the findings of

the ALJ "are not subject to reversal merely because there exists in the record substantial evidence

to support a different conclusion." *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001). Indeed,

the Sixth Circuit has made clear an ALJ's decision "cannot be overturned if substantial evidence

supports the claimant's position, so long as substantial evidence also supports the conclusion

reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

In sum, "[b]ecause the ALJ reached [his] decision using correct legal standards and because

those findings were supported by substantial evidence, the Court must affirm it, even if reasonable

minds could disagree on whether the individual was disabled or substantial evidence could also

support a contrary result." *Postell v. Comm'r*, No. 16-1364, 2018 WL 1477128 at *10 (citing *Wright

v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003)); *see also Longworth v. Comm'r of Soc. Sec.*, 402

F.3d 591, 595 (6th Cir. 2005) ("If substantial evidence supports the Commissioner's decision, this Court will defer to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion."). As noted *supra*, the substantial evidence standard presupposes "there is a zone of choice within which the [ALJ] may proceed without interference from the courts." *Felisky*, 35 F.3d at 1035.  For all the reasons set forth above, the Court concludes the ALJ's findings herein are within that "zone of choice."

## VII.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED.**

 *s/Jonathan D. Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

Date: March 3, 2020